IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs June 25, 2019

**STATE OF TENNESSEE v. SHALONDA RENEE PETTUS**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-C-2163    Angelita Blackshear Dalton, Judge**

_____

**No. M2018-01851-CCA-R3-CD**

_____

The defendant, Shalonda Renee Pettus, entered an open plea to aggravated child neglect, and the trial court sentenced her to fifteen years' incarceration in the Tennessee Department of Correction. On appeal, the defendant argues the trial court improperly weighed enhancement factor (1). After reviewing the record and considering the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jay Umerley, Nashville, Tennessee, for the appellant, Shalonda Renee Pettus.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Glenn Funk, District Attorney General; and Jeffrey A. George, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

The defendant was charged with murder in the perpetration or attempt to perpetrate aggravated child neglect. She subsequently agreed to plead guilty to aggravated child neglect. Pursuant to *Hicks v. State*, the defendant agreed to be sentenced as a Range II offender with sentencing to be determined by the trial court. 945 S.W.2d 706, 709 (Tenn. 1997). A sentencing hearing was held on April 12, 2018.

During the sentencing hearing, the State introduced the presentence report as well as the testimony of Detective Chris Bowden. Detective Bowden with the Metro Nashville Police Department testified he responded to Metro General Hospital on October 22, 2016, and encountered the six-month-old victim, who was taken to the hospital by his mother, the defendant. Although hospital staff attempted to resuscitate the victim, they were unable to revive him, and death was pronounced shortly after arrival. The defendant told Detective Bowden that she placed the victim on her bed before falling asleep on the couch. When she awoke several hours later, the defendant found the victim unresponsive. She attempted to perform CPR and rushed him to the hospital.

Detective Bowden then accompanied the defendant to her apartment and reviewed the scene. The bed where the defendant had placed the victim was a full-sized adult bed, and had numerous items on it including a pack of cigarettes, a loose cigarette, a package of condoms, a baby toy, clothing, a bottle, a green plastic bag, a burned spoon, a shoe, a cleaning bottle, and an ash tray containing cigarettes, a "marijuana blunt," and an item "used to smoke crack cocaine." The plastic bag was "twisted into a narrow cylindrical shape" that appeared to be the same shape and size as the victim's throat. Detective Bowden noticed fluid on the bag and sent it to the crime lab for further analysis. The DNA recovered from the plastic bag matched a DNA sample from the victim.

Detective Bowden testified the Department of Children's Services ("DCS") also conducted an investigation in this case. A DCS case worker asked the defendant to submit to a drug test the same day the victim was taken to the hospital. The results of the drug test revealed the defendant tested positive for benzodiazepines, cocaine, methamphetamine, and cannabinoids.

On cross-examination, Detective Bowden acknowledged the victim did not have drugs or alcohol in his system at the time of his death, and the autopsy report indicated there were no signs of abuse or trauma. Following Detective Bowden's testimony, the State concluded its proof. The defendant called Ruthie Pettus, Chantele Toran, Fannie Mae Jones, Toya Nettles Pettus, Nakia Nicole Caffee, and Jameyia Pettus as witnesses.

Ruthie Pettus[1], the defendant's mother, testified the defendant was a "loveable" person and "loves her kids." When the defendant began dating the victim's father, Ruthie was worried for her daughter because the victim's father was "hostile" and "controlling" toward the defendant. She hoped the defendant received the minimum sentence and "any type of treatment" available to her. On cross-examination, Ruthie admitted she was unaware of the defendant's drug issues prior to the victim's death.

---

[1] Because several witnesses have the same last name, Pettus, we will refer to them by their first name. We intend no disrespect.

Chantele Toran testified she owned the day care center the defendant's children attended. Ms. Toran read a letter she wrote to the trial court regarding the defendant. She described the defendant as a "kind loving mother" and stated the defendant would "drop[] everything to make sure that her kids are okay."

Fannie Mae Jones, the defendant's grandmother, testified the defendant was "a good person." However, when the defendant was dating the victim's father, "they [were] always having disagreements." Ms. Jones did not believe the defendant should be in jail for a long period of time because she needed help for her "drug problem."

Toya Nettles Pettus, the defendant's aunt, testified the defendant was "sweet" and "caring" as a child. Toya stated the defendant was "not a murderer" and should be rehabilitated instead of going to jail.

Nakia Nicole Caffee, the defendant's aunt, testified her son and the defendant grew up together, and the defendant "was always very loving." She did not think the defendant deserved to be "thrown in a cage with . . . murderers and pedophiles" because losing her son is punishment enough.

Jameyia Pettus, the defendant's sister, testified she was raising the defendant's four-year-old daughter while the defendant is incarcerated. Although she knew the defendant smoked marijuana, Jameyia did not think it prohibited the defendant from being a good mother. When she learned of the victim's death, Jameyia met the defendant at the hospital and stayed with her while she was interviewed by Detective Bowden. She hoped the defendant would get the minimum sentence because she didn't "mean[] to do anything."

The defendant testified on her own behalf, stating the victim was a "happy" baby. On the morning of his death, the defendant placed the victim on her bed, and, when she checked on him a few hours later, "he looked unconscious." After performing CPR, she drove him to the hospital. Although she acknowledged being negligent in placing the victim on the bed, when asked about Detective Bowden's work, the defendant stated she felt the pictures of her bed did not depict "the way it was." She also denied using several of the drugs that showed up in her drug screen and stated the crack pipe was from a houseguest. However, she did admit to using cocaine and marijuana occasionally.

On cross-examination, the defendant reiterated her claim that the pictures of the bed did not accurately reflect its appearance that night. Specifically, she testified the chemical bottle, shoe, ashtray, and spoon were not on the bed that night. Although she did not believe Detective Bowden put those items on the bed, the defendant stated "he

scattered it around" to make it appear as if "everything was just laying there around my baby."

Following the defendant's testimony, the court suspended the hearing to allow the State to subpoena Detective Bowden as a rebuttal witness. Prior to the second sentencing hearing, the defendant filed a motion to withdraw her guilty plea, and her attorney filed a motion to withdraw as counsel. The trial court granted trial counsel's motion to withdraw and appointed the defendant new counsel. The defendant subsequently "struck" the motion to withdraw her guilty plea.

At the second sentencing hearing, the defendant called Dawn Harrington and Ruthie Pettus as witnesses. Ms. Harrington testified the defendant completed two parenting programs while incarcerated and was a "standout in the class." Ruthie testified the defendant, if not incarcerated, would live in her home.

The defendant then made a statement on her own behalf. During her allocution, the defendant stated she did not "intentionally put [the victim] in harm's way." She also apologized for not "being completely honest" at the first sentencing hearing but stated she is ready to "move on and recover from that day."

In sentencing the defendant, the trial court considered the evidence presented during the sentencing hearing, including the presentence report, testimony offered, and the arguments of counsel. In reviewing the applicable enhancement factors, the trial court found enhancement factors (1), the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (4), a victim of the offense was particularly vulnerable because of age or physical or mental disability; and (14), the defendant abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or fulfillment of the offense. Tenn. Code Ann. § 40-35-114(1), (4), (14). The trial court found no applicable mitigating factors and sentenced the defendant as a Range II offender to fifteen years at 85 percent. This timely appeal followed.

### *Analysis*

On appeal, the defendant argues the trial court erred in improperly weighing enhancement factor (1). Specifically, the defendant asserts the defendant's prior conviction of domestic assault has "no bearing" on an aggravated child neglect sentence, and the trial court did not properly explain why the prior misdemeanor conviction enhanced her current sentence. The State contends the trial court properly exercised its discretion in imposing the defendant's sentence. We agree with the State.

- 4 -

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See id.* §§ 40-35-114, -210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id.* § 40-35-210(e).

When an accused challenges the length and manner of service of a sentence, this Court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancement or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Although the defendant contends enhancement factor (1) is inapplicable because her prior domestic assault conviction has "no bearing" on her current sentence, she has cited no legal authority to support her claim. Enhancement factor (1) does not require the prior convictions or criminal behavior to relate to the current sentence. Instead, the prior convictions or criminal behavior must only be "in addition to those necessary to establish

the appropriate range." Tenn. Code Ann. § 40-35-114(1). Additionally, the defendant argues the trial court failed to explain why the prior conviction enhanced the conviction. However, in its order, the trial court listed all applicable enhancement factors and adequate reasoning for each.

Moreover, the defendant's sentence is presumed reasonable. The defendant was convicted of a Class B felony and faced a sentencing range of twelve to twenty years. Tenn. Code Ann. § 40-35-112(b)(2). The trial court applied enhancement factors (1), (4), and (14) and found no applicable mitigating factors. The trial court then imposed a sentence of fifteen years to be served at 85 percent.

Our review of the record indicates the trial court imposed a within-range sentence after properly considering the evidence adduced at the sentencing hearing, the presentence report, the principles of sentencing, the parties' arguments, the nature and characteristics of the crime, and evidence of mitigating and enhancement factors. Tenn. Code Ann. §§ 40-35-103(5), -114, -210(b). Therefore, the trial court did not abuse his discretion in sentencing the defendant, and the defendant is not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
J. ROSS DYER, JUDGE